**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**BRUMAN ALVAREZ,**

    **Plaintiff,**

    **v.**                                                      **Civil Action No.: MJM-22-2382**

**CORIZON HEALTH, INC., et al.,**

    **Defendants.**

---

## <u>MEMORANDUM OPINION</u>

Self-represented Plaintiff Bruman Alvarez filed this civil rights action against Asresahegn Getachew, M.D.; Samuel Rahman, M.D.; Janette Clark, N.P.; Ryan Browning, LPN; Doctor/Nurse Doe; the Department of Public Safety and Correctional Services ("DPSCS"); Western Correctional Institution ("WCI"); Sharon Baucom, M.D.; Bradly O. Butler, A.W.; Ralf Salke; James Tinney; John Rainey; and Corizon Health, Inc.[1] ECF Nos. 1, 9. All individual defendants are sued in their individual and official capacities.

Defendants DPSCS, WCI, Baucom, and Butler (collectively, "the State Defendants") filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on May 24, 2023. ECF No. 31. Defendants Rahman, Getachew, Clark, Browning, and Salke (collectively, "the Medical Defendants") filed a Motion to Dismiss or Alternatively for Summary Judgment on June 21, 2023. ECF No. 39. Alvarez filed responses in opposition to both motions. ECF Nos. 43 & 47. State Defendants replied. ECF No. 50. Defendants Rainey and Tinney[2] filed a Motion to Dismiss or Alternatively for Summary Judgment on January 17, 2024, which adopts and incorporates the

---

[1] This case is and remains stayed as to Corizon Health, Inc. pursuant to ongoing bankruptcy proceedings.

[2] References to "Medical Defendants" include Rainey and Tinney.

Medical Defendants' Motion. ECF No. 55. Alvarez filed a response in opposition to this motion. ECF No. 73. On January 12, 2024, Alvarez filed an Emergency Motion for Temporary Restraining Order. ECF No. 57. At the Court's direction, the State Defendants filed a response to Alvarez's emergency motion. ECF No. 67. On April 25, 2024, Alvarez filed a Motion for Appointment of Counsel. ECF No. 81.

A hearing is not necessary to resolve the pending motions. *See* Loc. R. 105.6 (D. Md. 2023). For the following reasons, the Court will grant the State Defendants' motion, deny Alvarez's emergency motion, deny Medical Defendants' and Rainey and Tinney's motions, and grant Alvarez's motion for appointment of counsel.

## I.    BACKGROUND

### A.  <u>Complaint Allegations</u>

At all times relevant to the Complaint, Alvarez was incarcerated at WCI. ECF No. 1 at ¶ 1. Alvarez brings this action pursuant to 42 U.S.C. § 1983 for violation of his Eighth Amendment rights and related state law claims. *Id.* ¶ 19. Alvarez brings seven claims: (1) refusal to provide medical care in violation of the Eighth and Fourteenth Amendment; (2) failure to properly train and supervise; (3) failure to intervene and protect; (4) intentional infliction of emotional distress; (5) discrimination against a "protective" class; (6) negligent hiring by the DPSCS Defendants; and (7) ongoing denial of medical care. ECF No. 1 at 57–69; ECF No. 9 at 3–13.[3] He seeks declaratory relief as well as $7,000,000 in compensatory damages and $250,000 in punitive damages. ECF No. 1 at 70; ECF No. 9 at 14.

---

[3] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case File (CM/ECF) system.

In support of his claims, Alvarez outlines detailed allegations regarding his history of medical issues and care during his incarceration. Alvarez states that he suffers from several medical issues. First, since 2009, Alvarez has suffered from lower back pain and numbness. ECF No. 1 ¶ 4.. Second, since 2008, following several knee surgeries, Alvarez was diagnosed with arthritis in both knees. *Id.* ¶ 7. He also suffered a new injury to his left knee in September 2021. *Id.* ¶ 11. Alvarez also requires prescription eyeglasses for a degenerative eye disease. *Id.* ¶ 9. Alvarez contends that medical providers failed to evaluate him for cancer after he discovered a lump in one of his testicles. *See id.* ¶ 113.

Alvarez asserts that he was not provided medically necessary care because of "a policy of operational deficiencies." ECF No. 1 ¶ 12. He states that due to a "freeze-frame policy," Corizon, which was contracted to provide all medical care for DPSCS inmates, failed to do so. *Id.* ¶¶ 13–14. Alvarez alleges that the treatment protocol is set forth in Corizon Health Utilization Management Policies and Procedures Standards of Care. *Id.* at 15, ¶ 70. Regardless, Alvarez contends that doctors were deliberately not hired to avoid providing care, and Alvarez has suffered as a result. *See id.* ¶¶ 16–17. He also contends that Corizon has a Cost Containment Program which permits medical providers to send inmates to the hospital only in the case of medical emergencies. *Id.* ¶ 84.

According to Alvarez, Corizon has an extensive history of impropriety and providing substandard medical care to inmates. *See id*. ¶ 80. He alleges Corizon is "writing off the liquidated damages . . . as the cost of doing business in Maryland without doing anything meaningful to improve the shortage of staff or inadequate care." *Id.* ¶ 82. Further, the State of Maryland had actual and constructive knowledge of Corizon's improper business practices before contracting

with them. *Id.* ¶¶ 87–90. Additionally, DPSCS officials failed to take reasonable steps to ensure Alvarez received timely medical care. *Id.* ¶ 91.

### 1. Back Pain

Alvarez states that on or about June 2009, he slipped and fell at Jessup Correctional Institution, which caused him severe lower back pain with tingling and numbness down to his foot, and he was diagnosed with sciatica. ECF No. 1 ¶ 94. He was sent to Dr. Harjit Bajaj in the Bon Secours Neurology Department, who concluded he did not have neuropathy but, if his symptoms worsened, an MRI and other testing would be necessary. *Id.* ¶ 159. His symptoms continued through 2014, during which time his pain was treated with various medications. *Id.* ¶¶ 95, 96. He was transferred to WCI in September 2014. *Id.* ¶ 97. Alvarez's pain medications were all discontinued in favor of Neurontin in light of developing ulcers and gastric intestinal complications. *Id.* ¶¶ 100, 161. His prescription was later discontinued without cause in June 2015 but was quickly reinstated after Dr. Barrera diagnosed him with a herniated disk. *Id.* ¶¶ 103, 164. Alvarez was referred to an orthopedic doctor, Dr. Roy J. Carls, who, on July 9, 2015, diagnosed him with lumbar disk disease and recommended an MRI. *Id.* ¶¶ 104, 164–65.

Alvarez alleges that, in December 2017, DPSCS implemented a "freeze-frame policy" with all inmates prescribed non-formulated drugs, which discontinued those medications "*unless and until* inmates show complete mobility disabilities." *Id.* ¶ 107 (emphasis in original). Thereafter, his requests for Neurontin were denied. *Id.* ¶ 108. His back pain and related symptoms have worsened since. He states that, from 2018 to the present, DPSCS and Corizon have refused to recognize his diagnosis for sciatica and herniated disk disease. *Id.* ¶¶ 109–10. He attributes this to their chronic understaffing of medical providers and the termination on all chronic care treatment under the freeze-frame policy. *Id.* ¶ 110. Specifically, he alleges that, in February 2018, Dr.

Getachew denied Alvarez's request to renew his Neurontin prescription. *Id.* ¶ 170. Getachew also refused to reinstate the prescription on May 31, 2018, and denied his request for an MRI. *Id.* ¶ 171. Instead, Getachew prescribed him psychotropics, Nortriptyline and Celebrex, and failed to notify Alvarez of the possible side effects, including depression. *Id.*

Once Alvarez notified WCI that he was suffering from depressive episodes in July 2018, he was referred back to Getachew to review his medications. ECF No. 1 ¶ 172. On July 26, 2018, Getachew told Alvarez he would discontinue the psychotropics but instead increased the dosage. *Id.* ¶ 173. Alvarez was referred back to Getachew again on September 21, 2018, and he requested an MRI and a prescription for Neurontin. *Id.* ¶ 176. Getachew denied his requests again. *Id.* Alvarez reported the side effects and continuing pain to Getachew again on October 4, 2018, and Getachew told him that if he stopped taking the medication he would be considered to have refused treatment. *Id.* ¶ 177. On October 14, 2018, Alvarez refused his medication but later acquiesced upon threat of being put on segregation. *Id.* ¶ 178. Only after Alvarez filed a grievance about taking medication against his will did Getachew discontinue the medication. *Id.* ¶¶ 180–81. However, Getachew failed to provide Alvarez with any alternative treatment plan for his back pain. *Id.*

Alvarez alleges that he reported severe back pain in various sick calls between September and December 2020. ECF No. 1 ¶¶ 198, 203. Specifically, on September 19, 2020, he reported pain, numbness, and tingling on his left side lasting days and traveling down to his toes. *Id.* Alvarez states that Nurse Clark denied his requests for pain relief and an MRI. *Id.* On September 25, 2020, Nurse Clark provided him with a steroid, Medrol, and stated she would submit a request for an x-ray of his lower back but failed to do so; the x-ray was still not completed after he filed a grievance about the matter. *Id.* ¶¶ 199–200. Nurse Clark allegedly refused Alvarez's testing requests again on October 18, 2020, even after Alvarez informed her of Dr. Bajaj's 2009 recommendations. *Id.* ¶

202. Clark again refused his requests for treatment on December 27, 2020, told Alvarez he would have to accept that he would live with pain for the rest of his life, and reiterated that there was nothing that could be done for him. *Id.* ¶ 204. She denied Alvarez's requests again on February 17, 2021. *Id.* ¶ 205. Alvarez asserts that the other sick calls submitted during this time period were either denied or ignored. *Id.* ¶ 198.

### 2. Testicular Lump

Following a self-examination, Alvarez sought medical attention for a small and painful lump in his right testicle. ECF No. 1 ¶ 113. He states that several nurses recommended that he be evaluated, but from December 2017 to January 2020, he could not obtain any treatment because there was no doctor working at WCI. *Id.* at 26, ¶ 116. On January 27, 2020, Alvarez was finally evaluated by a part-time doctor, who confirmed the existence of a lump and recommended a case cane exam. *Id.* ¶ 119. Defendants denied the request for the case cane exam, but Alvarez continued requesting treatment. *Id.* ¶¶ 119–21. On May 15, 2020, doctors again confirmed the presence of the lump and recommended an ultrasound, which was denied by Getachew and Corizon. *Id.* ¶ 122; 36, ¶ 185. The same doctors evaluated Alvarez again on May 29, 2020, to provide more information to Getachew so that the ultrasound would be approved. *Id.* ¶¶ 124, 186.

Alvarez asserts that an ultrasound was denied a third time by Getachew, but an ultrasound was performed on June 11, 2020, at Western Maryland Medical Hospital, although no further care was provided. ECF No. 1 ¶¶ 126–27, 186. On June 21, 2020, Nurse Clark explained that the ultrasound showed the lump was caused by masturbation and advised him to stop. *Id.* ¶¶ 131, 197. Nurse Clark denied his request for a blood test to rule out cancer. *See id.* ¶¶ 129, 131. Alvarez contends that a blood test was medically necessary and Defendants continued to deny his requests.

*Id.* ¶ 133. No treatment could be provided because Corizon did not hire a qualified physician to provide appropriate treatment. *Id.* ¶ 188.

### 3.   Eye Exam

Alvarez states that from February 9 to 12, 2022, he requested an eye exam after breaking prescription eyeglasses that he had for more than five years, which were causing him headaches and vision issues. ECF No. 1 ¶ 141. Alvarez was not evaluated by an ophthalmologist for over a year. *Id.* ¶ 143. New prescription eyeglasses were recommended but were never provided to Alvarez. *Id.* ¶¶ 143–44. Alvarez continues to suffer from vision impairment and headaches. *Id.* at ¶ 145.

### 4.   Knee Injury

Alvarez injured his knee on October 29, 2021, when he was kicked during a fight with another inmate. ECF No. 1 ¶ 134. He was denied medical care because no doctor was available and was told he would not see one unless his injuries were life threatening. *Id.* ¶ 136. A month later, a nurse observed that Alvarez's knee was swollen, bruised, and liquid was present around his knee cap. The nurse ordered an x-ray and gave Alvarez "an Iced-Bandage." *Id.* ¶ 137. Alvarez alleges that the failure to hire qualified medical staff prevented timely diagnosis and treatment. *Id.* ¶ 139.

Alvarez made several reports of his injury through sick calls between October and November 2021. ECF No. 1 ¶ 210. When Alvarez saw "Doctor/Nurse Doe" on November 23, 2021, it was noted that he had fluids around his left meniscus; an x-ray was ordered along with an ice-bandage and Tylenol. *Id.* ¶ 212. Alvarez submitted multiple sick calls because the orders had not been fulfilled. *Id.* ¶¶ 213, 215–16. The x-ray was taken on December 2, 2021, but Alvarez alleges no one informed him of the results. *Id.* ¶ 214.

On January 16, 2022, Alvarez submitted a sick call regarding his knee pain, but Nurse Doe did not schedule him for a sick call visit. ECF No. 1 ¶ 219. On January 28, 2022, Nurse Doe told Alvarez that a referral would be placed to a provider for his knee injury but that it would be difficult to obtain approval for an MRI because it was expensive. *Id.* ¶ 220.

### 5.  Chronic Conditions

According to Alvarez, he also suffers from arthritis and seasonal allergies. ECF No. 1 ¶¶ 148, 150. He contends that DPSCS refused to recognize these preexisting conditions and failed to provide him with the necessary medications to manage them. *Id.* ¶¶ 151–53. As a result, Alvarez continued to suffer from his arthritis and allergy symptoms, including pain and discomfort in his knees and bronchitis. *Id.* ¶¶ 154–56. Alvarez further asserts that he submitted sick calls regarding a rash and psoriasis in December 2021, but Nurse Doe failed to schedule him for sick calls. *Id.* ¶¶ 217-18. Not until February 12, 2022, did Nurse Doe see Alvarez for his psoriasis, but no treatment was provided at that time. *Id.* ¶ 222. He alleges that the failure was a result of the freeze on all medical care and refusal to hire doctors. *Id.* ¶¶ 154–56.

### 6.  Corizon and DPSCS Deficiencies

Alvarez states that there is extensive reporting and court records documenting Corizon's improper business tactics and failure to provide adequate medical care, citing termination of Corizon contracts following legal action and Corizon's settlement of claims for deficient medical care. ECF No. 1 ¶ 80. Alvarez states that Corizon's customary substandard performance violates its contract with DPSCS. *Id.* ¶¶ 81–83. According to Alvarez, Corizon made false and misleading statements to DPSCS that he was receiving ongoing care even though Corizon failed to provide him with needed medical services. *Id.* ¶ 85.

8

Moreover, Alvarez contends, Corizon failed to fulfil its contractual obligations by operating WCI without sufficient staff. ECF No. 1 ¶ 238. He states that chronic care inmates could not obtain medical orders as a result. *Id.* Alvarez attributes Corizon's failures to its cost-saving policy in Maryland, under which it does not retain enough medical professionals to staff prisons. *Id.* ¶ 239. He also asserts that Corizon has a custom or policy of appointing nurses to investigate their own employer in response to grievances without authorizing these nurses to overturn decisions made by professionals with higher credentials. *Id.* ¶ 240.

Alvarez alleges that DPSCS had actual and constructive knowledge of Corizon's improper business practices before entering into the contract with Corizon and did so to save money. ECF No. 1 ¶¶ 87–88. Moreover, DPSCS had actual and constructive knowledge that Corizon was providing inadequate care in Maryland prisons starting in 2018. *Id.* ¶ 89. Officials at WCI knew that Corizon was failing to take reasonable steps to treat Alvarez. *Id.* ¶¶ 90–91. DPSCS knew Corizon was understaffed, failed to take any corrective action, and prevented WCI officials from addressing Corizon's systemic failures at their facility. *Id.* ¶ 93. Alvarez asserts that DPSCS negligently contracted with Corizon because their cost-saving policies and operational deficiencies were known before they were hired. *Id.* ¶¶ 241–42. He alleges that they knew or should have known that Corizon had previous contracts terminated due to those deficiencies, medical negligence, and civil rights violations. *Id.* ¶ 243.

Alvarez claims that DPSCS and WCI officials allowed Corizon to conduct its own grievance investigations and "implemented a 'free-for-all' policy," which allows low-level medical providers to investigate complaints against high-level medical providers. ECF No. 1 ¶¶ 246–47. Since 2018, Defendants Dr. Getachew, Dr. Raham, NP Clark, LNP Browning, Dr. Baucom, Mr. Butler, and Does have responded to sick calls requests and letters from Alvarez

concerning the failures in treatment by only reminding staff to follow existing policies and procedures. *Id.* ¶ 250. Getachew, Raham, Baucom, and Butler advised that they would support the recommendations of Alvarez's doctor, but because no qualified doctor worked at WCI, no such recommendation could be made. *Id.* ¶ 251.

According to Alvarez, Getachew, Raham, and Baucom implemented the freeze-frame policy which denied him necessary testing and imaging as well as treatment for his back pain, testicular lump, and vision disorder. ECF No. 1 ¶¶ 252–53. Getachew, Raham, and Baucom also failed to properly train and supervise DPSCS employees to ensure that Alvarez received the necessary medical care. *Id.* ¶ 254.

Alvarez alleges that Salke, Tinney, and Rainey "maximized and increase[d] the level of Medicaid reimbursement to the Maryland DPSCS and promote a cost-saving policy within their modus operandi and directly sanction all policies" challenged in the Complaint. ECF No. 9 ¶ 317. He asserts they had a duty to ensure inmates receive necessary medical services and to determine and implement Corizon's strategic plans. *Id.* ¶ 318. Salke, Tinney, and Rainey "maintained monthly meetings and or [*sic*] conference calls with their employees, servants, agents and DPSCS officials to review Corizon's performance within the provision of medical services for DPSCS." *Id.* ¶ 319. They had authority to hire medical professionals on behalf of Corizon and to create policy for the provision of care. *Id.* ¶ 320.

Alvarez also sought relief from Assistant Warden Butler regarding his medical care concerns on numerous occasions: June 20, 2019; January 7, June 27, July 17, October 10, and December 22 and 27, 2020; February 22, April 15 and 26, November 3 and 9, and December 1, 2021; and February 28, 2022. ECF No. 1 ¶ 224. Alvarez's grievances were continually dismissed, and he was instructed that he would be monitored through the sick call process. *Id.* ¶ 225. Even in

the instance where Butler found one of Alvarez's grievances meritorious in part, WCI-0700-20, he did not take any action to intervene or to have Alvarez scheduled for an examination or treatment; instead, he noted only that medical staff will be reminded to follow policies and procedures. *Id.* ¶ 226. Butler continued to respond similarly to Alvarez's other grievances. *Id.* Alvarez states that on February 7, 2021, Butler announced via WCI's local circuit TV that he was in daily communication with the medical department about their operational deficiencies. *Id.* ¶ 227.

Alvarez sent four letters to Clinic Director Dr. Sharon Baucom regarding his treatment on November 16, 2020, and August 9, September 8, and September 24, 2021. ECF No. 1 ¶ 229. He described his chronic pain and requested approval for an MRI or EMG nerve study, evaluation of his back pain, referral to a pain management clinic, approval for lab testing, evaluation of his eyes and testicles, prescription eyeglasses, and reform of the freeze frame policy. *Id.*

In additional letters dated February 14 and December 15, 2020, and August 20 and October 22, 2021, Alvarez requested evaluation of all his medical conditions, "insurance that his health and safety is protected by exercising statutory authority," and to intervene on his behalf due to the noted operational deficiencies. ECF No. 1 ¶ 230. Alvarez specifically noted that Dr. Getachew, NP Clark, and Doctor/Nurse Doe were preventing him from receiving the necessary treatment and that no qualified medical professionals were working at WCI. *Id.* He also included the report from Dr. Bajaj. *Id.* Dr. Baucom responded to Alvarez's letters instructing him: "please do not hesitate to utilize the sick call/ARP process, and let us know." *Id.* ¶ 231.

Alvarez states that he received responses to many of his letters from Corizon. *See* ECF No. 1 ¶¶ 232–35. He asserts that the responses contain deliberately false and misleading statements concerning his medical care. *Id.* ¶ 236.

Alvarez asserts that he continued to request treatment in chronic care for his various conditions from July to November 2019, but Nurse Doe refused to schedule him for referral appointments or chronic care. ECF No. 1 ¶¶ 189–90, 192. Specifically, he claims that he submitted several sick call requests in the spring of 2020 for testicular evaluation and ultrasound, but Nurse Doe ignored or failed to process his requests due to the freeze frame policy. *Id.* ¶ 191. He also lists several other instances in which Nurse Doe refused to process sick calls, referrals, and chronic care appointments. *Id.* ¶¶ 193–95.

Alvarez sent a letter regarding his need for treatment and evaluation to the Western Regional Medical Director, Dr. Rahman, on November 18, 2021. ECF No. 1 ¶ 206. He complained that he was not being provided necessary chronic care treatment due to the freeze-frame policy, which resulted in ignored sick calls, failure to schedule appointments and follow ups, failure to evaluate new injuries, and no improvement of operational deficiencies. *Id.* Alvarez states that no efforts were made to correct these issues. *Id.* ¶ 207.

Alvarez contends that as the Administrative Grievance Investigator, LNP Browning has authority to correct and enforce medical orders and to intervene in medical care and is therefore responsible for the lack of care provided despite the grievances filed by Alvarez on several occasions between 2019 and 2022. ECF No. 1 ¶ 208. According to Alvarez, Browning discussed each of the relevant medical conditions with him, notified him that they did not have the credentials to supersede Dr. Getachew's orders, refused to have Alvarez evaluated by another doctor because there was not one available at WCI, and did not want to challenge Dr. Getachew's opinion. *Id.* ¶ 209. As such, Alvarez asserts Browning blocked his access to medical care. *Id.*

### B. **Declarations**

Sharon Baucom, M.D. attests that she was employed as the DPSCS Chief Medical Officer from June 2001 until July 2022. ECF No. 31-3 ¶ 1 (Baucom Decl.). She states that her position was administrative and she did not provide medical care to inmates and had no supervisory authority over the contracted private medical staff. *Id.* ¶¶ 2–3. Medical staff report to their own medical director, and any complaints "are managed by the nurse consultant assigned to that region." *Id.* ¶¶ 3–4. Baucom avers that she did not respond to any inmate letter or complaints regarding medical care and did not interfere with any medical treatment. *Id.* ¶¶ 4–5.

Assistant Warden Butler also attests that he has no personal involvement in the provision of medical care to any WCI inmate, nor does he have any authority to make medical decisions for inmates. ECF No. 31-4 ¶ 2 (Butler Decl.). Furthermore, he is not a licensed medical provider and not responsible for monitoring inmates' medical care, and therefore he must defer to the expertise of the onsite medical staff. *Id.* ¶ 3. Thus, in reviewing inmate complaints, Butler avers that he relies on the reports from medical providers to prepare a response. *Id.* ¶ 5. Butler denied interfering in any inmate's medical care. *Id.* ¶ 6.

### C. **Grievances**

State Defendants submit ten administrative remedy procedure ("ARP") complaints reviewed by Butler concerning the events raised in the Complaint. ECF No. 31-1 at 4. State Defendants assert that Alvarez complains only about the medical providers and does not mention any of the State Defendants in his ARPs. *Id.*

#### 1. **ARP-WCI-1164-20**

On May 27, 2020, Alvarez submitted an ARP complaining that medical providers were delaying care for his testicular lump. ECF No. 32 at 1. Butler found the ARP meritorious in part,

finding that there had been a delay in scheduling Alvarez for an ultrasound. *Id.* at 2. Based on an investigation conducted by LPN Browning, Butler found that several requests for an ultrasound had been submitted but returned for more information to be provided. *See id.* at 2–5. The last request was approved. *Id.* Alvarez did not appeal Butler's decision to the Commissioner of Correction ("Commissioner"). ECF No. 31-15 ¶ 3.a. (Renee Emerick Decl.).

### 2.  ARP-WCI-1165-20

On May 27, 2020, Alvarez submitted an ARP complaining that his sick call requests for treatment of his allergies and related symptoms had been ignored. ECF No. 32-1 at 1. Butler dismissed the ARP because Alvarez's sick call had been addressed via letter instructing him to treat his symptoms with items available through commissary. *Id.* at 2, 5. Alvarez later saw a provider who prescribed him Claritin. *Id.* at 2, 6–7. He did not appeal Butler's dismissal to the Commissioner. ECF No. 31-15 ¶ 3.b.

### 3.  ARP-WCI-1490-20

On July 17, 2020, Alvarez submitted an ARP regarding his back pain and arthritis and complaining that his prescriptions for Tylenol and Claritin had not been processed and he had not received the necessary care. ECF No. 32-2 at 1. Butler dismissed ARP because Alvarez's Tylenol prescription was discontinued and he could otherwise obtain it through commissary. *Id.* at 2–4. Furthermore, his request for Claritin was denied because it was too soon to refill the prescription. *Id.* Alvarez did not appeal Butler's dismissal to the Commissioner. ECF No. 31-15 ¶ 3.c.

### 4.  ARP-WCI-1933-20

On October 10, 2020, Alvarez submitted an ARP about his back pain that he asserted was not being addressed through the sick call process. ECF No. 32-3 at 1, 3. He stated that NP Clark had prescribed a steroid and ordered an x-ray, but he continued to have numbness down his leg

and the x-ray was never completed. *Id.* Butler dismissed the ARP because records did not show any x-ray order nor that Alvarez was told that one would be placed. *Id.* at 2, 4–12. Furthermore, Alvarez reported improvement after taking the steroids and was advised to stretch, continue using NSAIDs (non-steroidal anti-inflammatory drugs) for pain relief, and avoid high impact activities. *Id.*

Alvarez appealed Butler's dismissal to the Commissioner on November 23, 2020. ECF No. 32-3 at 14. The appeal was dismissed because Alvarez "failed to substantiate" his claim. *Id.* at 13. Alvarez appealed to the Inmate Grievance Office ("IGO") on March 1, 2021. ECF No. 31-16 ¶ 3.a. (F. Todd Taylor, Jr. Decl.). The grievance was dismissed as meritless because it was against the medical staff employed by a private health care contractor. *Id.*

### 5.  ARP-WCI-2425-20

On December 27, 2020, Alvarez submitted an ARP complaining again about the medical providers' failure to provide necessary care. ECF No. 32-4 at 1, 3. Butler dismissed the ARP based on LPN Browning's investigation, which found that Alvarez's complaints had been addressed by providers. *Id.* at 2, 4-13. Alvarez appealed the dismissal to the Commissioner on January 19, 2021. *Id.* at 15-16. The appeal was dismissed because Alvarez failed to provide any additional evidence that he had not received proper medical care. *Id.* at 14. Alvarez appealed to the IGO on May 7, 2021. ECF No. 31-16 ¶ 3.b. The appeal was dismissed as meritless because it complained only about the medical staff. *Id.*

### 6.  ARP-WCI-0265-21

On February 22, 2021, Alvarez filed another ARP about treatment for his lower back pain, specifically, that an MRI had not been requested as promised. ECF No. 32-5 at 1, 3. Butler found the ARP meritorious in part based on LPN Browning's investigation, which showed that Alvarez

had been seen by providers but no MRI had been recommended following x-ray results, despite Alvarez's insistence. *Id.* at 2, 4–10. Alvarez appealed the dismissal to the Commissioner on April 4, 2021. *Id.* at 12. The appeal was dismissed, finding that Alvarez's complaint had been addressed in full. *Id.* at 11. Alvarez appealed to the IGO on September 13, 2021, but his complaint was again dismissed as meritless because it concerned only medical staff. ECF No. 31-16 ¶ 3.c.

### 7.  ARP-WCI-0569-21

Alvarez filed an ARP on April 15, 2021, regarding his vision issues. ECF No. 32-6 at 1. Butler found the ARP meritorious because Alvarez had not been scheduled with optometry. *Id.* at 2-4. Alvarez appealed the finding to the Commissioner on May 23, 2021. *Id.* at 6–7. The appeal was dismissed because the issue was addressed in full; Alvarez was on the schedule to be seen by optometry. *Id.* at 5. Alvarez appealed to the IGO on November 29, 2021, but the appeal was dismissed because he failed to state a basis upon which to "disturb the dismissal." ECF No. 31-16 ¶ 3.d.

### 8.  ARP-WCI-2038-21

On November 3, 2021, Alvarez filed an ARP about a knee injury following a fight and the inadequacy of the subsequent treatment provided as well as for unrelated pain in his knee and foot. ECF No. 32-7 at 1, 3. Butler found the ARP was meritorious in part because Alvarez had not yet been scheduled to see a medical provider for his pain complaints. *Id.* at 2, 4–7. Alvarez appealed Butler's decision to the Commissioner on December 10, 2021. *Id.* at 9. Additional information was requested, and Alvarez resubmitted his appeal on January 10, 2022. *Id.* at 8. However, the appeal was dismissed because it was not timely submitted. *Id.* Alvarez appealed to the IGO on January 27, 2022, but the appeal was dismissed as meritless because it concerned only privately employed medical staff. ECF No. 31-16 ¶ 3.e.

16

### 9. ARP-WCI-2268-21

Alvarez filed an ARP on December 1, 2021, complaining that he had not received adequate treatment for his left knee injury. ECF No. 32-8 at 1. Butler found the ARP meritorious because there had been a delay in providing Alvarez his medication and ace wrap. *Id*. at 2–7. Alvarez appealed to the Commissioner on January 20, 2022, and he was instructed to provide additional information but failed to do so. *Id.* at 8. Still, Alvarez filed an appeal to the IGO on February 10, 2022; it was dismissed as meritless because it concerned only privately employed medical staff. ECF No. 31-16 ¶ 3.f.

### 10. ARP-WCI-0372-22

On February 28, 2022, Alvarez filed an ARP alleging an ongoing failure to provide medical treatment for his chronic back pain, knee injury, and testicular lump. ECF No. 32-9 at 1, 3. Butler found the ARP meritorious in part because there was a delay in scheduling an evaluation with a provider. *Id.* at 2, 4-11. Alvarez did not appeal this decision to the Commissioner. ECF No. 31-15 ¶ 3.j.

## II.   LEGAL STANDARDS

Defendants move to dismiss the Complaint for failure to state a claim or alternatively for summary judgment. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must

show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the

18

complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The Court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b). When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The Court notified Alvarez that he had the right to respond to Defendants' Motions, that the Motions could be construed as ones for summary judgment, and that if he did not file a timely and adequate written response, the Court could dismiss the case or enter judgment against him without providing him another opportunity to respond. ECF Nos. 34, 40. Moreover, Defendants' Motions, which identify summary judgment as possible relief, provided sufficient notice for Alvarez to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Alvarez has responded in opposition to all Defendants' motions. Thus, the Court is satisfied that Alvarez has been advised that Defendants' motions could be treated as ones for summary judgment and

that he has been given a reasonable opportunity to present materials in response to the motions. The Court will resolve the motions under Rule 56 where appropriate.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

### III.   DISCUSSION

#### A. <u>State Defendants</u>

The State Defendants argue that the Complaint should be dismissed or that they are entitled to summary judgment in their favor because: (1) DPSCS and WCI are not entities subject to suit; (2) Defendants are immune from suit in their official capacities; (3) Alvarez has failed to exhaust his administrative remedies; (4) there is no respondeat superior liability for Butler and Baucom; (5) Defendants did not fail to provide medical care; and (6) Butler and Baucom are entitled to qualified immunity. ECF No. 22-1.

#### 1.   WCI

At its core, a civil rights action under 42 U.S.C. § 1983 is directed to unlawful conduct under color of law. *See Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379 (4th Cir. 2014). Section 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Thus, essential to sustaining an action under § 1983 is the presence of two elements. A plaintiff must demonstrate that: (1) he suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Because WCI is not a "person" subject to suit or liability under § 1983, the Complaint must be dismissed against WCI.

### 2.  Eleventh Amendment Immunity

Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147 (1981) (per curiam)). Additionally, claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *See Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violations brought under § 1983. *See Pevia v. Hogan*, 443 F. Supp. 3d 612, 632 (D. Md. 2020). Therefore, the Complaint against DPSCS, a state agency, must be dismissed. Furthermore, to the extent Alvarez sues the remaining State Defendants in their official capacities, the Complaint must be dismissed against them as well.

### 3.  Exhaustion of Administrative Remedies

Defendants Butler and Baucom assert that the claims against them must be dismissed because Alvarez has failed to exhaust his administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. ECF No. 31-1 at 19–22. The PLRA provides, in pertinent part: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

22

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

The doctrine governing exhaustion of administrative remedies has been well established through administrative law jurisprudence. It provides that a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). Therefore, a claim that has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). In other words, exhaustion is mandatory, and a court ordinarily may not excuse a failure to exhaust. *See Ross v. Blake*, 578 U.S. 632, 639 (2016) (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion") (alteration in original)). However, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones*, 549 U.S. at 215–216; *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219; *see also*

*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (recognizing that exhaustion provides prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners "pursue administrative grievances until they receive a final denial of their claim[s], appealing through all available stages in the administrative process" so that the agency reaches a decision on the merits. *Chase*, 286 F. Supp. 2d at 530; s*ee also Gibbs v. Bureau of Prison Off.*, 986 F. Supp. 941, 943–44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust where he did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or final administrative review after prison authority denied relief"); *Griffin v. Bryant*, 56 F.4th 328 (4th Cir. 2022) (recognizing PLRA's "strict" requirement to exhaust all available administrative remedies").

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see also Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("The . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines . . . ." *Woodford*, 548 U.S. at 88. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) (finding that "the

24

inmate cannot be required to exhaust [administrative remedies] . . . when prison officials prevent inmates from using the administrative process").

DPSCS has established ARPs for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann., Corr. Servs. ("C.S."), § 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01B(1) (defining ARP). The grievance procedure applies to the submission of a "grievance against an official or employee of the Division of Correction [DOC] . . . ." C.S. § 10-206(a). Regulations promulgated by DPSCS concerning the ARP process define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(7). To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any DOC official or employee. *See* C.S. § 10-206(a). When the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO. If, however, the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b).

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP request with his facility's "managing official." COMAR 12.02.28.05(D)(1). "Managing official" is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and is defined under C.S. § 1-101(m) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Correction. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B).[4] When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a).

If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it "without a hearing . . . ." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge ("ALJ") with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07–.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); Md. Code Ann., State Gov't, § 10-206(a)(1).

A decision of the ALJ denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within

---

[4] If the Commissioner fails to respond, the grievant shall file an appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

fifteen days after receipt of the proposed decision of the ALJ. *See* C.S. §§ 10- 209(b)(2), (c); COMAR 12.07.01.10(B).

The statute provides for judicial review. C.S. § 10-210. But "[a] court may not consider an individual's grievance that is within the jurisdiction of the [IGO] or the Office of Administrative Hearings unless the individual has exhausted the remedies provided" in C.S. §§ 10-201 through 10-210.

Defendants assert that, during the relevant period, Alvarez failed to file any ARP regarding the conduct of the State Defendants. ECF No. 31-1 at 21. Curiously, however, both declarations from Renee Emerick and F. Todd Taylor, Jr., state that they were asked to find any ARPs or IGO complaints regarding medical care that were specifically reviewed by Butler. *See* ECF No. 31-15 ¶ 2; ECF No. 31-16 ¶ 2. State Defendants provide no information regarding whether someone other than Butler reviews ARPs at WCI, and it does not appear that a search was made for complaints *against* either Butler or Baucom. Thus, at this stage, it is unclear whether there were ARPs reviewed by someone other than Butler and/or ARPs against Butler or Baucom. Notably, in his Complaint, Alvarez references several other ARPs which are not addressed by State Defendants. *See* ECF No. 1 ¶¶ 225–26. Alvarez identifies additional ARPs in his opposition. *See* ECF No. 47 at 2–5. As such, the Court finds that State Defendants have failed to establish Alvarez's failure to exhaust administrative remedies, and, therefore, the Court will turn to the merits of Alvarez's claims against Baucom and Butler.

### 4. Supervisory Liability

State Defendants argue that Alvarez's claims against Baucom or Butler must be dismissed because the Complaint does not allege any personal participation by either Baucom or Butler in a constitutional violation. ECF No. 31-1 at 22–25.

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Specifically, supervisory liability under § 1983 for a medical care claim must be supported with evidence: "(1) [that] the supervisory defendants failed promptly to provide an inmate with needed medical care[;] . . . (2) that the supervisory defendants deliberately interfered with the prison doctors' performance[;] . . . or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Slakan*, 737 F.2d at 372–73 (discussing supervisory liability for an inmate's beating by prison guards); *King v. Rubenstein*, 825 F.3d 206, 224 (4th Cir. 2016).

All of the allegations against both Baucom and Butler are essentially complaints that they were made aware of Alvarez's medical conditions via either ARPs or letters but did not intervene in his medical care. Importantly, both Baucom and Butler attest that neither of them have authority over medical staff or the ability to make medical decisions for inmates at WCI. ECF No. 31-3, -4. The misconduct Alvarez alleges against Butler boils down to his dismissal of Alvarez's ARPs concerning medical care and failure to intervene even where the ARPs were found meritorious. Butler's decisions on Alvarez's various ARPs alone do not impose liability. Without more, it is

insufficient to impose liability upon Butler for allegedly inadequate medical care. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (holding that prison wardens and officials responsible for processing inmate complaints are "entitled to relegate to the prison's medical staff the provision of good medical care"). Similarly, Alvarez's letters to Baucom regarding his medical care cannot alone establish that she denied him adequate medical care when the record shows that she did not have authority to take any action personally. *See, e.g.*, *Wright v. Genovese*, 694 F. Supp. 2d 137, 161 n.16 (S.D.N.Y. 2020) (letter complaints to prison's Chief Medical Officer (CMO) were "insufficient to establish personal involvement" because the CMO "referred the matter to a subordinate for decision and did not personally make any medical decisions regarding the plaintiff").

As there is no evidence showing that either Butler or Baucom personally failed to provide Alvarez medical care or, had the authority to do so, or that either interfered with Alvarez's treatment or otherwise authorized the alleged constitutional violations, Alvarez's claims against them fail.[5] *See Miltier*, 896 F.2d at 855.

---

[5] "When, as here, the federal claim[s are] dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–727 (1966). Accordingly, Alvarez's claim for intentional infliction of emotional distress will be dismissed without prejudice.

### 5. Temporary Restraining Order

Alvarez has also filed an Emergency Motion for Temporary Restraining Order against the State Defendants. ECF No. 57. He seeks an order from the Court that he be sent to an orthopedic specialist for examination of his knees and lower back. *Id.* at 1–2.

A party seeking the extraordinary remedy of a temporary restraining order or preliminary injunction must demonstrate: (1) by a "clear showing" that he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–23 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292–93 (4th Cir. 2011). "All four requirements must be satisfied." *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) (brackets omitted) (quoting *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2006), *vacated on other grounds* 559 U.S. 1089 (2010)); *see also Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (noting that Fourth Circuit's prior test of balancing the factors is no longer good law in light of *Winter*). Additionally, in the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). Such circumstances are not present here.

Alvarez's request must fail, because, as discussed above, his claims against the State Defendants cannot proceed. Thus, although other factors may weigh in Alvarez's favor, he cannot show that he is likely to succeed on the merits of his claims against the State Defendants, and his motion for temporary injunctive relief against State Defendants must be denied for this reason alone.

### B. **Medical Defendants**

The Medical Defendants submit with their Motions to Dismiss or Alternatively for Summary Judgment more than 500 unorganized pages of Alvarez's medical records.[6] *See* ECF Nos. 39-2 to -11; *see also* 55-1 at 3 (Defendants Rainey and Tinney referencing medical records). Their memoranda, however, offer no specific statements of facts established by the medical records for the Court's consideration in deciding whether they are entitled to summary judgment. The Medical Defendants also fail to offer any detailed argument that any of the counts asserted against them in the Complaint are inadequately pleaded. The only discernable arguments offered are (1) that Alvarez's allegations are insufficient to state a claim because they simply disagree with medical providers' decisions, and (2) that should any of the Medical Defendants be considered supervisors, any claim of supervisory liability fails. *See* ECF No. 39-1 at 7, 8. These arguments cannot be considered adequately responsive to the extensive allegations raised in the Complaint. The Medical Defendants' motions will be denied without prejudice.[7]

## IV.    CONCLUSION

For the foregoing reasons, the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment will be granted. The Complaint will be dismissed as to DPSCS and WCI, and summary judgment will be entered in favor of Butler and Baucom. Alvarez's Emergency Motion for Temporary Restraining Order will be denied.

---

[6] Local Rule 105.5 states: "Parties are responsible for ensuring all exhibits are clear and well organized. When appropriate, parties should facilitate the Court's review of exhibits to include, for example, highlighting key language. If any motion, memorandum, or brief is accompanied by more than five (5) exhibits, the exhibits shall be tabbed and indexed, with cross-references to the page numbers that relate to each exhibit."

[7] The Court notes that Medical Defendants requested, and were granted, an extension of time to file a reply to Alvarez's opposition. ECF No. 78. However, Medical Defendants did not file a reply by the extended deadline. Defendants Rainey and Tinney also declined to file a reply in support of their motion.

The Medical Defendants' Motions to Dismiss or Alternatively for Summary Judgment will be denied without prejudice.

As this case will proceed to discovery as to the Medical Defendants, Alvarez's Motion for Appointment of Counsel will be granted, and counsel will be appointed for Alvarez.

A separate Order follows.

  6/7/24_____
Date

Matthew J. Maddox
United States District Judge

32